here we hear we hear we the United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and his Honorable Court. Good morning and welcome to the second day of our panel sitting. Uh Judge Rosenbaum, Judge Newsome and I, um, would, of course, uh, hope that we could be in Jacksonville with all of you. But obviously, the storm had other ideas, and we're keeping everybody in the path of the hurricane in our in our thoughts and in our in our prayers. Um, we don't think there will be any technology problems. But if we go offline for some reason, just hang with us. We've got excellent staff who will try to get us back on board as quickly as possible. And with that, um, we are ready to begin. So we will start with our first case, which is 21-11467 United States versus Ivan Scott. Astorious Valerie. Do we have Miss Pastorius on the line? There she is. Okay. Yeah. Here is Miss Pastorius. Good morning, Your Honor. Yes, I can. Okay, we're ready to start with your with your argument whenever you're ready. Yes, Your Honor. A small note. I was just booted off of the zoom about two minutes ago. So if that happens, I mean, we're in the thick of the storm here in understand that there may be issues for you or for some of us, so we'll just try to get through it as best as we can. Don't worry about it. Yes, Your Honor. Good morning, Your Honor's mate. Please. The court at issue. We have a threshold question. Uh, the government, the government submit that the government presents sufficient evidence that Ivan Scott conspired to or committed health care fraud. I submit to you that Ivan Scott did not conspire to or commit health care fraud because, from his belief that the cancer genetic tests were preventative screening tests that were covered by Medicare. Uh, the government's case rests on two premises on this point. Uh, first that there was a false representation that they land on as far as to Medicare is that these tests were not medically necessary. And for the medically necessary definition, they're relying on the concept that one. These tests had to have been for the diagnosis or treatment of a patient who was exhibiting symptoms at that time or had otherwise been advised that these tests were appropriate by the treating physician. And I submit to you that this has been modified that the Medicare statutes at issue that are in the indictment of the alleged as the government that these have been relies on a 13 95 X. And I believe that is excuse me one second. Uh, provision at 13 95 X. Uh, triple D. I believe. And then in that provision in subsections one and two, those were enacted in 2009 under MIPA and subsections three under that section shows that these provisions were modified by the A. C. A. To bring into the Medicare coverage preventative and screening tests. Furthermore, the government, the government makes several arguments. The first is that it presented both documentary and expert testimony about its view that these sort of cancer screening tests were not covered under the statutes and regulations. So that's the first argument. And the second argument is that you didn't really show anything to contradict that perspective. District Court sought for sort of the same thing that you didn't present any evidence to challenge the government's interpretation of the statutory and regulatory scheme. What is your response? Oh, well, my response would be that the burden is on the government to show that there's that there's no other reasonable interpretation of the coverage standards beyond a reasonable doubt. And so the burden was on the government to show that there's only one standard espoused. But the defense on cross examination of the government's witness, Quindosa, they were able to elicit testimony that one, it doesn't have to be a treating physician that orders preventative and screening tests. So right there, you have an ambiguity set forth by the government's own expert. And second, the government, the government's expert also stated that the Medicare does sometimes cover screening tests. So here we have some ambiguity that the government's own expert admits to as far as the coverage of these tests. But didn't he say that the screening tests that are covered are things like colon cancer screening and mammography, things of that type? I mean, did he suggest in any way that when you don't have a personal history of cancer, that the types of full genetic screenings that that occurred here were covered? Yes, he did set forth a limitation in his testimony about the specific types of tests that have been enunciated in the 400 statutes for quite some time, like the colorectal screening. What's interesting about that, though, is that like the colorectal screening, which is obviously covered by Medicare is graded a C test by the United States Preventative Services Task Force. And it's the appellant's position that all USPTF grade A and grade B tests are mandated to be covered by the ACA. The modifications under 1395X on this point require that the secretary issue a framework for health risk assessments. And in that framework for health risk assessments after 2010, that the 12 of that assessment, and let's see, that's at DE 128, page 48, it expressly states that all grade A and grade B tests are covered. So there is a reasonable interpretation that these grade A and grade B tests are covered, which includes the BRCA germline hereditary genetic test that issue in So what I'm looking at right now is a table from the recommendation summary. And it does say women with a personal or family history of breast, ovarian, tubal or peritoneal cancer, or an ancestry associated with BRCA1,2 gene mutation, there is a recommendation under grade B, but then it says grade D, women whose personal or family history or ancestry is not associated with potential harmful BRCA1,2 gene mutations, the task force recommends against routine risk assessment. Right? Right. And I'm not going to pretend that this isn't dense. You know, I have consulted with the healthcare expert on the nature of the statutes and so forth. And so I would say that the issue isn't 100% resting on the idea that these are absolutely covered tests under Medicare. But before I depart from that point, I would like to refer you to chapter 18 of the Medicare claims manual, which unequivocally states that these grade A and grade B tests by the USPTF are to be covered. And the Medicare claims manual that's issued by CMS. So the government's relying on an expert which Mr. Mendoza, he had two and a half years of experience prior to 2005, working with CMS. And after that, he's been in, you know, private practice as an investigator and so forth. And the government didn't present a CMS expert or an HHS expert or personnel to speak to these particular issues at all. So we have, you know, that I want to speak that he was qualified as an expert and accepted by the defense as well. But we have testimony from someone who is not with CMS, saying this is the way that these things are covered or not covered. Can I ask you? I'm sorry. Go ahead. No, it's okay. Go ahead. Just so I have this kind of brass tacks question. This just seems like an odd just sufficiency of the evidence challenged me. I mean, we're here like debating statutory interpretation and regulatory interpretation and CMS regulations and agency documents. Is this a traditional sufficiency of the evidence challenge? Or is this like a legal challenge to the sufficiency of the indictment? And if it's the latter, I mean, if it's really the latter, shouldn't it have been brought a long time ago? Yes, I'll concede on that point that, you know, that we did not, we're not proceeding on the issue of the sufficiency of the indictment. We are looking at Mr. Scott's level of knowledge, which is a point that I was going to shift to. So Mr. Scott's level of knowledge, as far as was healthcare fraud being committed by his co conspirators, I would submit to you that there was insufficient evidence of his particular knowledge of the healthcare fraud scheme, and an unlawful objective that he agreed to with his alleged on that point, all three of the cooperating witnesses for the government testified that in the beginning, they didn't know that they were committing a crime. None of them expressly said that, hey, I was committing healthcare fraud with Ivan Scott, right here, we have a sufficiency on what was the illegal objective. And none, none of it proves that Ivan Scott specifically had knowledge. I think this case is very like, and like Medina, where you have knowledge kickbacks, which the appellant has, has convicted, has conceded that there's sufficient evidence of the kickbacks. However, there's no evidence that ties him to a particular illegal objective to defraud Medicare. And I think the statute to our interpretation lends credibility to the fact that these preventative and screening tests, someone could reasonably have thought these are tests that are covered by Medicare, there's qualifying criteria that's being presented to him by his co conspirators. And we're saying, Mr. Scott, these tests are good enough, these tests are not good enough. Here's some patient history information that your telemarketers need to take in. And I see that my time is up. And I would respectfully submit, he was also not a leader organizer, because he did not supervise any other criminally responsible participant in the matter. Even in the, even in your discussion, though, about the task force recommendations, with respect to the grade B things, the recommendation is that primary care clinicians assess women with a personal or family history of breast, ovarian, tubal or peritoneal cancer, who have an ancestry associated with breast cancer susceptibility, one and two, gene mutations, etc. But then it says women with a positive result on the risk assessment tool should receive genetic counseling, and if indicated after counseling, genetic testing, and in this case, those things weren't complied with anyway. So even if, even if it's a, even if it should have somehow been covered, because of the the other parts of the recommendations weren't followed before the testing was recommended or testing was done, I guess. Well, and I would again defer to his role in the alleged conspiracy on this, on this on this point, because he, you know, unlike in cases like Willer and Medina, he didn't have a Medicare provider number, there's no evidence to show that he had any evidence in the healthcare industry at all. So his level of knowledge is less than any other participant here, like a physician or the laboratories or e-labs, where there was actually an intermediary between himself and the submission of the claims to Medicare. So as far as what was covered and why, I think that we're coming to a lower threshold on, on the analyzing Ivan Scott's level of culpability here, because in his, from his perspective, he didn't know whether these tests were really covered or not, but all the tests that were presented to him by the conspirators, who are more sophisticated than he was, showed him that there were certain criteria, and he was following through the procuring patients, procuring patients according to that criterion. Right, thank you very much, Miss Pistorius, you've saved your time for rebuttal. Thank you, Your Honor. Lieberman. Good morning, Your Honors, may it please the court, Dave Lieberman for the United States. Let me start with the sufficiency claim. Ample evidence supports the jury's guilty verdicts on the health care fraud counts, and this court should affirm those convictions. Counsel, I do have some concerns about that. It seems to me like one of the things you rest your argument on is the zero days email, you know what I'm talking about? Yes. Okay, but when you read the zero days email, it actually seems to say the opposite of what the government argued. It says, what do we do from here on out? I don't want to be a pain, it's just we are moving at a good pace, and I don't want zero days in between. Not I want zero days in between. What do you, how do you address that? So, so as we're here on the rule 29 sufficiency, and I, as we interpreted it, and I think this is supported by the other evidence in the record that Mr. Scott wanted rapid turnarounds between when he submitted the test to Med Symphony, and when the doctors returned the doctor's orders. And even if we are ambiguous, there is quite a bit of other evidence to demonstrate fraudulent intent as in that Mr. Scott knew that these doctor's orders were not based on any sort of doctor patient relationship. He and his co conspirators knew that they needed the test of the doctor's orders as a condition for getting Medicare claims, and that they then joined up the doctor's orders, and the test and facilitated the submission of those claims to Medicare. And another question about that. I noticed that one of the things that the government has argued was that he paid for orders, not consultations. But when I look at the actual payments, it looks like they match up to consultations, regardless of whether they resulted in orders. So for example, there were 77. In one case, there were 77 total consultations, 75 resulted in orders, there was a $100 fee per each, and the total fee paid was $7,700, meaning they paid, they paid for the consultations, even in two cases, when it didn't result in orders. And I wonder if you could just address that for me, please. Yes. So the testimony, I believe it was from Mr. Simmons, he was the med symphony owner, or he headed up that company, he directly testified that Mr. Scott was paying us for orders. And that is consistent with the approval rates. Miss again, it was a again, I believe it was Mr. Simmons, who confirmed that he was approving 98%, and sometimes 100% of the test requests that were coming in. So from that, and from his direct testimony about what the nature of the interactions in the arrangements were between med symphony, and Mr. Scott's company, a jury could well conclude that Mr. Scott was paying for a particular result for the doctor's order. And that is consistent with the other evidence in the case pertaining to Mr. Scott's knowledge about these doctors orders. Recall that he was having he was soliciting patients, having them take this expensive genetic screening tests first, and then he his company was contacting the telemedicine doctors directly and getting that order. So that tests first, get the doctor's order later, a jury could reasonably conclude that that is evidence of fraud, because it's the opposite of the way that it normally works. As we also noted in our brief, Mr. Scott's company collected the primary care physician information for every patient that his company solicited. And yet, this scheme cut the primary care physician out of the telemedicine doctors and, as I said before, paid he paid not the patient for the particular for a particular result. Finally, he also the doctor's orders and letters of medical necessity were coming back. And they were all using boilerplate language about the patient's medical condition. Stepping outside the orders, I'd like to also reference the contracts and invoices that Scott's company had, where he states that we were performing payroll services or consultation services or marketing services, no references to what the company was actually doing. And as we noted in our brief, if he genuinely thought that what he was doing, these doctors orders were legitimate, the patients had medical conditions, the test results would be used in the treatment of those patients, why not actually put down on the contracts and invoices, which were purportedly cataloging his company's activities, why not actually say, this is what my company is doing. So line all this evidence up. And we're obviously here on rule 29. Could a reasonable jury viewing the light in a viewing the evidence in light most favorable to the government, find that a find that Mr. Scott knew that these doctors orders were illegitimate? I think the answer is yes. And then the fraud falls, the fraud scheme falls into place. Because he and Mr. Scott as co-conspirators were using the these doctors orders to purportedly satisfy the Medicare requirements for having a doctor's order authorizing the test. If I could step back and reference some of opposing counsel's arguments about what Mr. Scott thought what he what his perspective was, there was nothing in the trial record, no direct testimony, no affirmative evidence from the defense about what he thought he was doing. So the question really is, could the jury viewing the gut what the government had used that trial, and some of the evidence that I just cataloged, recently conclude an attempt to defraud? And again, we think the answer is clearly yes. A number of the documents that Miss Petroius referenced the US Preventative Service Task Force report, the Medicare manual, the task force report wasn't even admitted at trial. So the jury didn't see it. And we also didn't, we don't know if Mr. Scott actually read it. So that's not an appropriate basis for gleaning his currently exists, amply supports the jury's verdict on a deferential sufficiency review. I'm going shifting to Judge Newsom's question. Miss Petroius, in her brief and today has made various arguments why maybe as a matter of law, Medicare was required to cover these genetic cancer screening tests. The government's brief answered all of those and happy to address any of those on their merits. But this is not a rule 29 is the proof that trial sufficient. This does strike me more as a challenge to the sufficiency of the indictment, which as the district court noted, and as we noted in our brief was not raised and is waived for the purposes of this proceeding. But in one sense, Mr. Lieberman, if you are arguing that the statutory and it's covered and not covered, that is an argument that potentially goes to Mr. Scott's intent, right? Yes. And uh, the, the trial record here was, as we charted in our brief, very clear about what Medicare requires for covering these diagnostic tests. The doctor must be treating the patient. The patient must be suffering a related medical sickness or illness. And the results of the test must be used in that treatment. And the trial record here is, uh, plain as day, all each of those standards were not satisfied. And so these tests were not covered by Medicare. Uh, and Mr. Scott and his co-conspirators accordingly obtained property, obtained money in the form of Medicare reimbursements to which they were not entitled. If I could just pause and ask, uh, and ask if the court has any additional questions on the government's sufficiency claims. Um, I will happily address them before I turn briefly to the guidelines issue. All right ahead. Thank you, your honors. Um, I'll focus on the organizer leader because that is a enhancement under 3B11. Uh, in the opening brief on page 52, uh, Mr. Scott raised one challenge, uh, to the district court's findings under the, this court's seven organizer leader factors. The government responded, uh, and, uh, there is no clear error in how the district court found those factors and ultimately concluded that Mr. Scott, uh, was in organizer leader based on his role and his company and his decision-making in the scheme. No clear error. Now in the reply brief on page four, Mr. Scott, for the first time referenced since language in application note two to the guideline, which says to qualify for an enhancement under this section, um, the defendant must have been the organizer leader manager or supervisor of one or participants. Uh, we think that that particular challenge is waived in this case because application of two was not referenced in the opening brief. Uh, and it, even if not that claim that, uh, an application of two claim, uh, would be here on plain error because the defense did not reference it below defense, not reference it in the PSR objections at docket entry one 42 pages, uh, 54 and 55 in the defense sentencing memorandum docket entry, one 46 pages three and four, or at the sentencing here. So if the court, even if the court were to entertain, uh, this applicant, this challenge based on application note two would hit here on plain error. And this, uh, would fail under all, for all the prongs, because even though the district court is not specifically focused on application note two, it effectively made the finding that Mr. Scott, uh, participant sentencing transcript docket entry, uh, one 66 starting at page 39. The district court notes that there were other participants to, uh, uh, the other co-conspirators, Mr. Miano, Mr. Simmons, Mr. Lorenas, and perhaps a few others. And then the court in discussing the organizer leader factors goes on. Did he exercise control over the co-conspirators? So I, I think he organized the record shows that he organized there's their activities and the district court said as much by noting that he obtained the test, submitted the test, use the spread and spreadsheets to sort of, uh, organize this entire scheme. He was the, also the one that formally retained in, uh, med symphony and coordinated the request for doctor's orders. And I'd like to, uh, also note at page one 70 of the transcript, the, um, district court specifically addresses the objection that Mr. Ms. Pistorius made in her reply group that Mr. Scott was actually getting guidance from the others, uh, other co-conspirators. He was not himself, um, supervising or managing or leading. And on page one 70, the district court acknowledges that evidence, but says there's ample evidence in the record that Scott was asking for this and then the district court then stresses his execution of leadership responsibilities after receiving that information. And so to borrow one of my, uh, my trial colleagues remarks during this back and forth without Ivan Scott here, there's, there's nothing happening. He is the engine that goes out and gets the test. And then all of his work organizes the downstream efforts by co-conspirators. So I'm plain error review, whether this is because the district court effectively made the finding or because, uh, Mr. Scott has not shown the opposite on prong three, uh, he cannot obtain relief on this, uh, application note to, uh, theory. Uh, finally, even if Mr. Scott somehow subverts, uh, somehow overcomes the abandonment and all the plain error prompts at most he'd been titled to a remand where the district court could decide whether or not to make the application note to finding as to at participant under no circumstances would be entitled to a de novo resentencing. So, uh, I have about a minute left. Um, uh, I'm happy to submit on my briefs, but I also will pause to see if the court has any questions, concerns, or requests for clarification about the record or any of the government's arguments in this case. Thank you. Your honors. The government asks that the court affirmed. I thank you very much. Mr Lieberman is best stories. You have your five minutes for rebuttal. Thank you, Your Honor. With respect to the leader organizer enhancement, the appellant respectfully submits that this was preserved both at the trial court and on appeal. The issue of, uh, the aggravated role enhancement was proper rebuttal for the government's argument that because which also was adopted by the district court that because Ivan Scott was the leader or organizer of Scott Global, the telemarketing company, then he would qualify for this enhancement. However, it was argued at the district court level at the sentencing hearing that just because he was a leader organizer of Scott Global, that's not enough. You know that he took direction on. This is what was specifically argued is that he took direction from literally everybody else in the scheme. Uh, you know, Mr Lieberman points out that he contracted with Met Symphony. That was that the direction of Cristiano from elapsed. There was a middleman service literally training him and directing on every step of what he needed to do. So the district court's finding here rest solely on the idea that Ivan Scott organized the ideas of Scott Global on that Ivan Scott was a leader over the employees of Scott Global. But the district court said none of the Scott Global employees are specifically the two that were presented in the government's case, Tiffany Scott and Juan Carlos, that neither of those two persons were criminally responsible. There was not sufficient evidence to find that they were criminally responsible, so he had no control over any of the actual co conspirators that were pointed out in the leadership organizer enhancement. Can I ask you to address, um, one of the arguments that your, um, adversary made about intent to defraud? I mean, isn't the sequencing sort of the really tough back for you to overcome? As he said, test first prescription later. Um, and that's just not how we do it, right? I mean, isn't that a pretty clear indication of an intent to defraud? Um, I think that, you know, to the purse and the perspective of the perspective that he was in where he was was recruited into this perspective into this conspiracy with absolutely no knowledge of the health care industry or their claims billing process. No relationship to the submission of the claims to Medicare himself. I think that he's removed from the role of really showing that the knowledge of how are these things supposed to proceed? As I mentioned before, under the A. C. A. Statutes under 35 13 95 X and under Mr. Windows of the government's expert testimony, he says these tests don't have to be ordered by a treating physician. And here we have 57 different physicians in the case that signed these orders. So if this if this case involved 57 different co conspirator physicians, where was their testimony in the case? And the court's allowed to consider the omission and the lack of evidence that there were no doctors that testified no laboratory owners owners that testified no one from CMS that testified. There's a huge missing link as far as showing. Oh, the order the sequence here is indicative that I haven't Scott had the same unlawful objective as the other co conspirators here. The evidence lacks here. The record lacks evidence that any of them actually conspired to commit health care fraud. You know, they're saying, um, it wasn't after a while that we got into this, that we became aware that, you know, this kickback arrangement was going to work. The conspiracy started before, you know, the alleged conspiracy started before Ivan Scott was drawn into it. And if we look at the timeline of the facts, it's around the time that Ivan Scott comes into it or shortly thereafter that Christopher Miano is consulting with attorneys to try to figure out if what he's running out of the labs is salvageable from a legal legal perspective. He can somehow bring this operation into compliance with respect to the kickbacks. But when it comes down to it, all the qualifying criteria that were taken in by the Scott global, um, personnel and then submitted and uploaded to the med symphony database, there's no reason to believe that Ivan Scott didn't know this wasn't actually qualifying criteria in order to obtain these cancer genetic tests. So as far as the sequencing goes, the idea that, um, a treating physician doesn't, you know, per the admission of the government's expert have to be the one that's ordering these tests. I think there's another reasonable interpretation here of how Ivan Scott viewed the legality of these of the coverage of these cancer genetic tests and also how his role and his perspective removed him far from being the person who was making any type of false representation of Medicare. You know, the claims would first go to E. Labs. Then, uh, E. Labs might reject some of them. The labs might reject some of them, and the teledoctors themselves did reject some of them. So there's no tip for tat. There's no I'm paying for orders, not for a physician to genuinely review these materials. I miss pastorious. Thank you very much, Mr Lieberman. Thank you as well. We'll take the case under advisement. Thank you.